# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSEPH WENDEL GRAFF AND | ) | Case No. 09-20928-DRD-7 |
| REBECCA ANN GRAFF, | ) | |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| JANICE A. HARDER, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Pro. No. 10-2027-DRD |
| | ) | |
| COLUMBIA GLASS & MIRROR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JANICE A. HARDER, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Pro. No. 10-2031-DRD |
| | ) | |
| J P P C S, INC. d/b/a PRECISION | ) | |
| CONSTRUCTION SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JANICE A. HARDER, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Pro. No. 10-2029-DRD |
| | ) | |
| STAR HEATING AND AIR | ) | |
| CONDITIONING COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

These adversary proceedings are before the Court on the Trustee's Complaint to Avoid Preferential Transfers Pursuant to 11 U.S.C. §547. The Defendants assert an affirmative defense under 11 U.S.C. §547(c)(2).[1] The cases will be considered together because the facts underlying each matter are essentially the same, as is the issue. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§1334(b), 157(a) and (b)(1). These are core proceedings under 28 U.S.C. §§157(b)(2)(E) and (F), which this Court may hear and determine and in which it may issue a final order. The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court will dismiss the claims asserted by the Trustee against all Defendants. While the Trustee established a prima facie case of receipt of preferential transfers, the Court determines that the Defendants have established that the transfers were made in the ordinary course of business, and rejects the Trustee's sole legal objection to the assertion of that defense under the circumstances.

**I. FACTUAL BACKGROUND**

The facts cited below have been stipulated by the parties. Debtors Joseph and Rebecca Graff, general construction contractors, filed a petition for relief under Chapter 7 of the Bankruptcy

---

[1] While each of the Defendants asserted the additional defense of contemporaneous exchange under §547(c)(1), each has either expressly abandoned the defense or admitted that it failed to adduce sufficient evidence at trial to sustain it.

Code on May 5, 2009. On November 13, 2008, Defendant Columbia Glass & Mirror, Inc. ("Columbia Glass") submitted an invoice to the Debtors in the amount of $481.71 for labor and materials they provided to the Debtors as subcontractors. On December 17, 2008, Columbia Glass submitted a similar invoice in the amount of $21,400 to the Debtors for payment. The Debtors periodically submitted a draw request to American Plaza, the owner of the property improved by the labor and materials reflected in the invoices. In a draw request dated January 5, 2009, the Debtors sought payment in the amount of $25,867.97. On that same day, the owner paid Debtors the amount requested; the payment included the amounts billed by Columbia Glass.[2] The check was deposited into the Debtors' checking account and commingled with their general funds. By check dated March 13, 2009, the Debtors paid Columbia Glass. In tracing the funds designated for Columbia Glass, the evidence indicates that the Debtors had a low account balance and that the funds designated for that Defendant were almost entirely depleted prior to the payment. The funds used to pay Columbia Glass came from a deposit related to a project with which Columbia Glass was not affiliated.

This fact pattern repeated in the Debtors' business dealings with Defendant JPPCS, Inc. d/b/a Precision Construction Services, Inc. ("JPPCS") and Defendant Star Heating and Air Conditioning, Inc. ("Star Heating"). Defendants JPPCS and Star Heating submitted their respective invoices to the Debtors, within the year preceding the Debtors' bankruptcy filing, for labor and/or materials they provided to the Debtors. Periodically, the Debtors submitted a draw request to the owner of the property improved by their work and materials. The property owner paid the Debtors the full

---

[2] The Trustee notes that American Plaza required Debtor Joseph Graff to sign a stamp affixed to the back of checks indicating that Debtors were required to use the funds to pay the subcontractors referenced in the draw request for which the check was in payment. There is no dispute about that. However, as discussed below, that is irrelevant to the Court's preference analysis.

3

Document      Page 4 of 15

amount of the draw request, the Debtors deposited the payment into their checking account and subsequently paid JPPCS and Star Heating the total amount invoiced using funds related to projects on which other subcontractors worked.[3] In every instance, the Defendants were unaware of the details of the draw request submitted by the Debtors to the owners, or the timing and amounts of payments by the owners to the Debtors. The payments made by the Debtors within the 90-day period preceding their bankruptcy filing are the ones being challenged by the Trustee.[4]

Although the Trustee conceded that the timing of the alleged preferential transfers was consistent with the timing of prepetition payments from the Debtors to the Defendants, she takes the position that the source of the funds transferred to a creditor is relevant in determining whether a preference is avoidable. In short, the Trustee contends that the manner in which the Debtors acquired the funds used to pay the Defendants (*i.e.*, using funds attributed to draw requests submitted for work performed by other subcontractors) is inconsistent with the ordinary course of business defense and its underlying policy. The Defendants urge this Court to reject the Trustee's position, arguing that the source of the funds used by the Debtors to pay them is not relevant to the ordinary course of business analysis as a matter of law.

## II. DISCUSSION

### A. Preferential Transfers

---

[3] Included with each check to Star Heating was a remittance advice for the allocation of the payment to identified invoices between the Debtors and Star Heating. The record indicates that this was not only the course of dealing between these parties, but a common and prevailing practice among construction contractors and HVAC suppliers.

[4] The Trustee asserts that the following payments are avoidable: the payment made to Star Heating on April 10, 2009, in the amount of $30,005.08; the payment made to Columbia Glass on March 13, 2009, in the amount of $21,881.71; and the payments made to JPPCS on February 25, 2009, and March 30, 2009, in the amounts of $26,754 and $39,305, respectively.

To avoid a pre-petition transfer as a preference under §547(b), six elements must be proven: 1) a transfer of an interest of the debtor in property, 2) on account of an antecedent debt, 3) to or for the benefit of a creditor, 4) made while the debtor was insolvent, 5) within 90 days prior to the commencement of the bankruptcy case, 6) that left the creditor better off than it would have been if the transfer had not been made and the creditor had asserted its claim in a Chapter 7 liquidation. *In re Interior Wood Products, Co.*, 986 F.2d 228, 230 (8th Cir. 1993). The trustee must establish each of these elements by a preponderance of the evidence. *In re Libby Int'l, Inc.*, 247 B.R 463, 466 (B.A.P. 8th Cir. 2000).

The legislative history of the Bankruptcy Code's preference section describes its dual purpose:

> First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section – that of equality of distribution.

H.R. Rep. No. 95-595, at 177-78 (1978); *reprinted in* 1978 U.S.C.C.A.N. 5787, 6138. *See also In re Jones*, 130 F.3d 323, 326 (8th Cir. 1997)(Section 547 "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy.").

In the three cases before this Court, the individual Defendants admitted in their respective Answers to the Trustee's Complaints each of the statutory elements to establish a preferential

transfer under §547(b), and conceded at trial that the Trustee made her prima facie case.[5] Accordingly, the Court will now address the affirmative defenses asserted by the Defendants.

### B. Ordinary Course of Business Defense

Section 547(c)(2) provides that a preferential transfer is excepted from avoidance if the transfer was (1) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and (2) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (3) made according to ordinary business terms. To prevail on the ordinary course of business defense, the creditor is required to prove the statutory elements by a preponderance of the evidence. *In re Gateway Pac. Corp.*, 153 F.3d 915 (8th Cir. 1998). The legislative history of §547(c)(2) reveals that the purpose of this section was "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 95-989 at 88 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874; H.R. Rep. No. 95-595 at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329. *See also In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 461 (Bankr. S.D.N.Y. 2007)("The

---

[5]JPPCS contends that the Trustee is applying the "earmarking doctrine" and thus, cannot satisfy the first element of §547(b) (*i.e.*, a transfer of an interest in the debtor's property). JPPCS is mistaken. In the first place, the earmarking doctrine is a judicially-created defense to a preferential transfer claim, so it would be incongruous for the Trustee to assert it. Additionally, it requires proof of three elements: (1) the existence of an agreement between a lender and debtor that new funds will be used to pay a specific antecedent debt, (2) the performance of the agreement according to its terms, and (3) no resulting diminution of debtor's bankruptcy estate. *In re Matlock*, 361 B.R. 879, 885 (Bankr. W.D. Mo. 2007). Here, the Debtors had complete control over the funds paid to them by the project owners, so the funds became part of the Debtors' estate. In addition, the payments were not made to the Defendants in accordance with the terms of an agreement between the owners and the Debtors. The doctrine simply does not apply.

ordinary course of business exception to the avoidance powers protects 'recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee.' ")(citing *In re Hedged-Investments Assocs.*, 48 F.3d 470, 475 (10th Cir. 1995)).

With respect to the first element, the parties have stipulated that all of the payments challenged by the Trustee were made in payment of debts incurred in the ordinary course of business between the Debtors and the Defendants. As to the second element, section 547(c)(2)(A) contemplates a subjective test: Was the transfer ordinary as between the debtor and the creditor? To be subjectively ordinary implies some consistency with other business transactions between the parties. *In re Valley Steel Corp.*, 182 B.R. 728, 734-35 (Bankr. W.D. Va. 1995)(citations omitted). Simply put, the cornerstone of the ordinary course of business defense is that the creditor must be able to demonstrate some consistency between the transfers at issue and other transfers between the debtor and this creditor. *In re Spirit Holding Co., Inc.*, 153 F.3d 902, 904 (8th Cir. 1998)(citations omitted). Even if the debtor's business transactions were irregular, they may be considered "ordinary" for purposes of §547(c)(2) if those transactions were consistent with the course of dealings between the particular parties. *In re Yurika Foods Corp.*, 888 F.2d 42, 44 (6th Cir. 1989)(citations omitted).

Because there is no precise legal test which can be applied, the Court must engage in a "peculiarly factual analysis" of the specific practices between the parties. *In re Armstrong*, 291 F. 3d 517, 526-27 (8th Cir. 2001); *Broadview Lumber Company, Inc.,* 168 B.R. 941, 950 (Bankr. W.D. Mo. 1994). Courts have established a four-part test to assist in the ordinary course of business analysis: (1) the length of time the parties were engaged in the transactions at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or the creditor engaged

in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition. *In re Laclede Steel Co.*, 271 B.R. 127, 132 (8th Cir. B.A.P. 2002)(citing *In re Spirit Holding*, Co., 214 B.R. 891, 897 (E.D. Mo. 1997); *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir. 1994)).

In each of the three cases before this Court, the Defendants presented evidence establishing that the alleged preferential payments were made in the ordinary course of business as that term has been defined.[6] The invoices submitted by the Defendants to the Debtors were typical of their particular relationship. The Defendants routinely accepted late payments from the Debtors. The form of tender was customary for their business dealings. None of the Defendants engaged in unusual collection efforts or put undue pressure on the Debtors so as to precipitate the transfers. Therefore, the issue before the Court boils down to this – Is the source of the funds used to make the alleged transfers relevant to the preference analysis?

### B. Relevance of Source of Payment to Ordinary Course Defense

The Trustee asserts that the source of funds the Debtors used to pay the Defendants supports avoiding the transfers and that the Debtors' business practices are inconsistent with the ordinary

---

[6]At trial, the Court was advised by counsel that the only remaining issue to be resolved was whether the source of funds used to pay the Defendants affected their ordinary course of business defenses; the Court was further advised that this was largely a legal issue, and that the parties had framed extensive stipulations on the essential background facts. Minimal additional testimony was offered at trial. The parties submitted post-trial briefs. In hers, the Trustee raised a number of additional issues potentially impacting the ordinary course of business defense, including whether evidence had been offered on certain of the factors cited above, such as the amount and form of tender (*e.g.*, payment by check), the existence of any abnormal collection activity and the payment of multiple invoices on the same date. With one exception, these observations were not supported by any evidence suggesting conduct that required explanation by Defendants, or if required, a satisfactory explanation was given. The one exception is evidence noted by the Trustee that the Debtors paid multiple invoices submitted by JPPCS on the same date. In its post-trial brief, JPPCS states that the evidence established that the payments were made in the ordinary course of business, referring the Court to Plaintiff's Exhibit Q, the parties' payment history. Exhibit Q reveals that two out of the seven transfers made by the Debtors to JPPCS covered multiple invoices. This is sufficient to refute the Trustee's allegation.

course defense.  The Trustee likens those practices to that of a "Ponzi scheme " and contends that those are not the sort of businesses which Congress intended to protect through the enactment of §547(c)(2).  That argument is flawed for two reasons: 1)  the statute itself does not impose a requirement to consider the source of the funds, and 2) the Trustee has cited no cases supporting the denial of the ordinary course of business defense under the same or similar facts.

The Trustee characterizes the Debtors' business practices as "quasi-fraudulent" because the Debtors obtained the funds from the property owners under false pretenses (*i.e.*, representing to the owners that the subcontractors would be paid in accordance with the draw request).  However, fraud is neither an element of proof on a prima facie preference avoidance action under §547(b), nor one of the enumerated defenses to the merits of such an action.  *In re Kmart Corp.*, 318 B.R. 409, 417 (Bankr. N.D. Ill. 2004)(citing *In re Stoecker,* 131 B.R. 979, 984 (Bankr. N.D.Ill. 1991)).  As the court stated in *In re American Continental Corp*., 142 B.R. 894, 900 (D. Ariz. 1992):  "Section 547 is not, on its face, an anti-fraud provision.  There are independent laws to redress fraud."  All of the Defendants maintain that they had no knowledge about the representations the Debtors made to the owners or the precise source of their payments.  The Trustee's focus on the relationship between the Debtors and the property owners is misplaced.  The express language of §547 as well as the cases construing it dictate an analysis based on the relationship between the debtor and the particular creditor asserting the defense, not between the debtor and a third party.  If indeed the owners maintain that the Debtors transacted business with them in a fraudulent manner, the proper remedy available to them would be an exception to discharge under §523.  Likewise, if the Trustee believes that the transfers to these Defendants were fraudulent as to the Debtors' other creditors, the proper remedy would be to file an avoidance action under §544 or §548.  In essence, the Trustee is

attempting to expand the scope of the preference section in a way that goes well beyond what its framers intended.

Furthermore, the Court rejects the Trustee's attempt to draw an analogy between the Debtors' business practices vis a vis these Defendants and a Ponzi scheme. A Ponzi scheme has been described as "a financial fraud in which a purported investment venture uses the capital it receives from a new round of investors to pay off its obligations to a previous round of investors, all the while conducting little or no actual business activity." *In re Bennett Funding Group, Inc.*, 253 B.R. 316, 318 n.3 (Bankr. N.D.N.Y. 2000)(citations omitted). *See also In re Armstrong,* 291 F.3d 517, 520 (8th Cir. 2001)("Ponzi schemes are fraudulent business ventures in which investors' 'returns' are generated by capital from new investors rather than the success of the underlying business venture."); *In re M & L Business Machine Company, Inc.*, 84 F.3d 1330, 1332 (10th Cir. 1996)(describing a Ponzi scheme as an investment scheme in which investors' returns are not financed through the success of the underlying business venture, but rather from principal sums of newly attracted investments). The Court recognizes that several courts have concluded that the ordinary course defense is inapplicable, as a matter of law, to transfers made by a debtor engaged in a Ponzi scheme. *See, e.g., In re Bullion Reserve of North America*, 836 F.2d 1214, 1219 (9th Cir. 1988)("transfers made in a 'Ponzi' scheme are not made in the ordinary course of business"); *In re Taubman*, 160 B.R. 964, 991 (Bankr. S.D. Ohio 1993)(same); *Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir. 1990)(same). In a typical Ponzi scheme, the "operator" attracts investors by promising them a substantial return on their investment. Here, the Debtors made no representations to the Defendants other than that they would pay them for their services. In turn, the Defendants' only expectation was to get compensated. In a typical Ponzi scheme, the operator must rely on the capital

10

infusion of new investors to pay the earlier investors since there is no underlying business to generate income. Here, the source of the Debtors' payments to the Defendants was income generated from their legitimate construction business. In a typical Ponzi scheme, the operator, motivated by his own financial gain, makes misrepresentations to new investors in order to perpetuate the fraud and continue delivering inflated returns. Here, the Debtors were simply trying to manage their cash flow, pay their subcontractors and suppliers, and maintain their construction business. There is no evidence that the Debtors were engaging in a fraudulent scheme in order to improve their own financial condition. By definition, these Debtors were not operating a Ponzi scheme.

Although the Trustee does not allege that the Debtors operated a Ponzi scheme in the strict sense, she does allege that these cases involve a "resulting Ponzi scheme" or "Ponzi scheme by performance," citing *In re Nation-Wide Exchange Services, Inc.*, 291 B.R. 131 (Bankr. D. Minn. 2003). The debtor in that case was a "Qualified Intermediary" for "like-kind exchanges." The company was retained by owners of business and investment property to receive the proceeds from the sale of such assets and hold them until they were reinvested in similar property. Complications occurred when the principal of the debtor deposited proceeds from various sales into a general account he maintained at a national brokerage firm. He subsequently made numerous short-term "day trades" from this commingled account and lost a substantial amount of the funds the debtor was to administer in like-kind exchanges. As a result, the debtor used the proceeds from sales of clients secured later to meet the disbursement obligations to earlier clients; the conversion of funds led to federal criminal charges against the principal and ultimately, imprisonment. The situation at hand does not fit that scenario. Unlike the debtor in *Nation-Wide*, the Debtors were engaged in a

11

legitimate business. They were not mismanaging funds entrusted to them by the property owners, nor were they converting the funds for their own financial gain. Rather the payments the Debtors made to their subcontractors and suppliers were funded by their construction projects, and they were merely paying them as cash became available, not unlike many struggling business enterprises.

The Court acknowledges that some courts have extended the reasoning behind the Ponzi scheme cases to legitimate business enterprises that conduct their operations in an unorthodox or illegal manner. The case of *First Federal v. Barrow*, 878 F.2d 912 (6th Cir. 1989), is indicative of this line of authority. The debtors in *Barrow* were engaged in the business of mortgage investments. Pursuant to a loan servicing agreement, the debtors purportedly collected the mortgage payments, deposited them into segregated escrow accounts, and made disbursements to the appropriate principal (*e.g.*, the taxing authority, insurance carrier). Instead, all monies received by the debtors were deposited and commingled with existing cash balances, and used to satisfy obligations incurred during previous days, weeks or months. Significantly, the record disclosed that the debtors made disbursements to certain favored creditors on behalf of selective investors. Following the bankruptcy filing, the trustee commenced an action to recover preferential payments; the bankruptcy court held that the transfers were in fact preferential and subject to recovery by the trustee. The Sixth Circuit affirmed the bankruptcy court's conclusion:

> This court cannot seriously consider appellants' assertions...characterizing the transfers here in issue as transfers made in the ordinary course of business or financial affairs of the debtors, given the totally unorthodox and illegal manner in which debtors conducted their collective business operations during the ninety-day predeclaration period. The obviously calculated fraudulent business manipulations designed to expedite the diversion and misappropriation of the mortgagors' and appellants' monies by commingling the purported escrow funds through the Salem Central Account, which consistently had a negative balance, do not comport

> with ordinary course of business practices commonly pursued by properly conducted mortgage companies or and/or service institutions.

*Id.* at 918 (citations omitted). *See also In re Montgomery*, 123 B.R. 801 (Bankr. M.D. Tenn. 1991) (check-kiting in connection with real estate closing business was a form of Ponzi scheme and not entitled to §547(c)(2) protection). Again, this case is distinguishable. The common denominator of the cases holding that the §547(c) defenses are not available is the pervasive nature of the fraud in which the debtors are engaged. Here, the Debtors ran a legitimate construction business, albeit one that was constantly in financial distress. As a consequence, the Debtors were routinely behind in their payments to the Defendants. They followed a course of conduct in their business relationships with the Defendants in terms of payment practices. They were not committing illegal acts nor were they engaging in activities that would result in their own personal gain. They were simply trying to stay afloat. While the Court acknowledges that there may have existed slight discrepancies in terms of the amounts in the draw requests submitted by the Debtors and misrepresentations as to the specific subcontractors who were to receive the funds, those business practices hardly rise to the level of fraud apparent in Ponzi-like schemes.

Other courts have disagreed with this broad-brush approach of making the ordinary course defense unavailable, as a matter of law, when the debtor is conducting business in an unorthodox or illegal manner. In *Hedged-Investments, supra*, for example, the Tenth Circuit reviewed the line of cases and the underlying policy of §547(c)(2), and concluded that they "do not support the sweeping rule that §547(c)(2) has absolutely no application in the context of a Ponzi scheme." *Hedged-Investments*, at 476. Instead, the court found that the precedent supports a narrower proposition:

> [T]he literal terms of §547(c)(2)(C) preclude application of the ordinary course of business defense to transfers made to *investors* in the course of a Ponzi scheme....none of the provisions of §547(c)(2) preclude its application to transfers made to noninvestor-creditors in the ordinary course of business and according to ordinary business terms. Moreover, the purposes of §547(c)(2) clearly are served by permitting its application to noninvestor-creditors whose transfers are received in the ordinary course of business....If, for instance, a Ponzi scheme uses telephone services, is billed for that service, and pays the phone company, disallowing the avoidance of that payment following a bankruptcy petition is consistent with the purposes of §547.

*Id.* (emphasis in original). *See also M & L,* at 1340 (rejecting the "sweeping rule" in favor of one allowing the ordinary course defense to be applied to payments made to non-investment creditors). In this case, the alleged preferential transfers were made to non-investors, but not in the context of a Ponzi scheme. Thus, while these cases do not involve facts which comport exactly with the facts at hand, the Court is persuaded by the reasoning behind them. If the transferee's only expectation was to get compensated for services provided, and the debtor made the transfer in the ordinary course of their business dealings, then permitting the application of the §547(c)(2) defense in that context is wholly consistent with its purpose.

The Trustee's position that the source of funds is relevant to a preference analysis is not supported by the statute itself or relevant case law. The consideration of how the transferor acquired the funds paid to the transferee is not encompassed by either the express language of §547, which focuses on the relationship between the debtor and the transferee, or the four-part test traditionally used by the courts to evaluate the ordinary course of business defense, no part of which implicates the source of funds used by the debtor to pay creditors. Additionally, allowing the defense in this context does not promote inequality among creditors and a "race to the courthouse" by any one creditor as the Trustee suggests. There is no evidence that the Debtors favored one subcontractor

over another.

Finally, the Trustee's position is untenable. It would not only require creditors to track the source of their payments, but also to monitor representations debtors made to third parties regarding their use of funds. That burden would most certainly deter rather than facilitate the customary transactions that §547 was designed to protect, a burden this Court is unwilling to impose. Therefore, the ordinary course of business defense should be available under these facts and evaluated according to traditionally applicable factors.

### III. CONCLUSION

As noted previously, the only issue remaining for resolution was whether the Debtors' source of funds was relevant to the determination of a preferential transfer and the application of the ordinary course defense. For the reasons stated above, the Court concludes that it is not. Because the Defendants otherwise met their burden of proof with regard to the §547(c)(2) defense, the Court denies the Trustee's request for an order avoiding the alleged preferential transfers.

ENTERED this 8th day of July, 2011.

/s/Dennis R.Dow
HONORABLE DENNIS R. DOW
UNITED STATES BANKRUPTCY JUDGE